UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JONATHAN FELPS, Individually and
On Behalf of All Others Similarly Situated,

    Plaintiffs,

v.                                                                              No. 18-811 MV/GJF

MEWBOURNE OIL COMPANY, INC.

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Emergency Motion for Corrective Notice, to Prohibit Class Communications by Defendants, to Set Aside Settlement Agreements, and For Fees and Costs ("Motion for Corrective Notice") [Doc. 64] and Plaintiff's Opposed Motion for Leave to File Supplemental Evidence in Support of His Emergency Motion for Corrective Notice ("Motion to Supplement") [Doc. 100]. The Court, having considered the motions and relevant law, finds that the Motion for Corrective Notice is well-taken in part will be granted in part, and that the Motion to Supplement is well-taken and will be granted.

## BACKGROUND

Defendant Mewbourne Oil Company is an oil and gas production company doing business in New Mexico, Oklahoma, and Texas. Doc. 36 ¶ 16. From 2014 to October 2016, Plaintiff Jonathan Felps worked as a Lease Operator, or Pumper, for Defendant at its Hobbs, New Mexico location. *Id.* ¶¶ 17-18. All of Defendant's Lease Operators perform the same job duties, namely, outdoor manual labor, including operating oilfield equipment, inspecting and

maintaining oilfield equipment, monitoring oilfield equipment, and collecting and relaying data to supervisors for analysis. *Id.* ¶ 25.

In August 2016, the United States Department of Labor ("DOL") commenced an investigation into Defendant's practices of classifying its employees, through which it determined that Defendant had been misclassifying its Lease Operators as exempt from the overtime protections of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. *Id.* ¶ 57. Based on this misclassification, all Lease Operators employed by Defendants, including Plaintiff, were paid only a base salary and received no additional compensation for hours worked in excess of 40 hours a week. *Id.* ¶ 23.

As a result of the DOL investigation, Defendant made back-wage payments to 53 of its Lease Operators and obtained DOL-approved releases from them. Doc. 12 at 5. Further, in October 2016, Defendant reclassified its Lease Operators as hourly, non-exempt employees entitled to overtime. Doc. 36 ¶ 58. It was not until June 21, 2017, however, that Defendant began paying its Lease Operators overtime for hours worked in excess of 40 hours a week. Doc. 44 at 2-3.

Plaintiff, who did not receive any funds as a result of the DOL investigation and did not sign any release of claims, Doc. 36 ¶ 61, commenced this action "individually and on behalf of all others similarly situated" against Defendant, asserting violations of both the FLSA and the New Mexico Minimum Wage Act ("NMMWA"). Doc. 36. Thereafter, Plaintiff filed a motion seeking conditional certification of an FLSA collective action [Doc. 12], which he later amended [Doc. 44]. On May 18, 2020, the Court entered a Memorandum Opinion and Order ("May 2020 Opinion") granting Plaintiff's amended motion for conditional certification of an FLSA collective action, conditionally certifying a class of "all persons who worked as a Lease

Operator or Pumper for Defendant at any time between October 31, 2015 and June 21, 2017." Doc. 111.

On April 25, 2019, Plaintiff's counsel advised defense counsel that Plaintiff would be moving for Rule 23 certification of a class action.  Doc. 64-1.  Soon thereafter, on May 6, 2019, Mewbourne held an "informational meeting" for its employees regarding their benefits. Doc. 71-5 ¶5.  Plaintiff contends that the meeting was "mandatory" for all employees, Doc. 64 at 3; Defendants do not dispute this contention.  "The meeting was scheduled approximately one week prior to the date of the meeting."  Doc. 71-5 ¶ 5.

In advance of the meeting, Mewbourne drafted a "Confidential Settlement Communication" (the "Settlement Letter") addressed to 56 of its employees, offering to pay each of them "$1,000 per year of employment as a lease operator with Mewbourne, through June 30, 2017, in exchange for a full release of any claims for unpaid wages and overtime pay that [such employee] may have under any state or local law."  Doc. 71-3.  "In the days leading up to the meeting," Scott Lacy, Mewbourne's Production Superintendent, "contact[ed] by telephone" these "56 employees . . . to inquire if they planned to attend the meeting and to notify them that there would be an envelope available for them after the meeting," and had "brief" conversations with "these employees."  Doc. 71-5 ¶ 6.

At the May 6, 2019 meeting, Robin Terrell, District Superintendent of Mewbourne's Hobbs, New Mexico office, announced "that employees who had been contacted about having an envelope waiting for them could pick the envelope up from the office's reception desk after the meeting."  Doc. 71-2 ¶ 6.  "After the meeting ended, most of the 56 employees to whom Mewbourne extended settlement offers picked up their envelopes from the receptionist at the

front office." *Id.* ¶ 7. "Mewbourne mailed the envelopes to the employees who did not pick them up in person." *Id.*

The Settlement Letter, signed by Lacy, advises that Jonathan Felps, a former lease operator, commenced this action against Mewbourne and Drew Greene, but does not include the name or caption of the instant case, or the name or contact information of Plaintiff's counsel. Doc. 71-3. The Settlement Letter indicates that Mewbourne and Greene "strongly disagree" with Felps's allegations and are "vigorously defending" against Felps's claims. *Id.* The Settlement Letter advises the recipient that, if the Court were to grant Plaintiff's request and certify a class action, "[he or she] would be part of Jonathan Felps' lawsuit if [he or she] did nothing." *Id.*

The Settlement Letter explains that Defendants' decision to extend "offer[s] of compromise to compensate" Mewbourne's lease operators was made "[i]n an effort to minimize ongoing costly and time-consuming litigation," and refers to the recipient as part of "the Mewbourne team." *Id.* The Settlement Letter notes that the recipient's "relationship with Mewbourne will be <u>completely unaffected</u> by [the recipient's] acceptance or rejection of this settlement offer," that whether the recipient accepts the offer "is completely up to" the recipient," and that this is a <u>voluntary process</u>." *Id.* (emphasis in original). The Settlement Letter also includes the following language: "Mewbourne hopes you will accept this offer;" and "I [Lacy] hope you will thoughtfully consider this letter." *Id.* The Settlement Letter advises the recipient to "read the Release carefully before signing it," but does not recommend that the recipient consult an attorney. *Id.* The Settlement Letter requests that if the recipient decides to accept the offer, he or she return the Release within 10 days of receipt of the letter. *Id.*

The Settlement Letter encloses a Settlement Agreement and Release (the "Release"). Doc. 71-4. The first sentence of the first paragraph of the Release states that the recipient, in exchange for a lump sum payment from Mewbourne, releases "any and all rights that [he or she] may have to file a claim, bring suit, or seek recovery for back wages and overtime pay under any state or local law, including but not limited to the [NNMWA]" against Mewbourne and its employees. *Id.* The fourth sentence of that same paragraph states: "I understand that my signing of this Release will extinguish *all* unpaid wage and overtime claims, including interest, penalties, and liquidated damages, I may have through today's date." *Id.* (emphasis added). Of the 56 employees who were presented with a Settlement Letter, 55 individuals signed a Release. Doc. 71-2 ¶ 11.

Caleb Ragsdale is a Mewbourne employee, currently working as a production foreman, who was presented with the Settlement Letter in connection with his previous work as a lease operator. He signed the Release. Ragsdale testified that he understood that, in signing the Release, he was "releasing [his] right to sue based on overtime wages." Doc. 100-2 at 12. He did not remember "which act it was under," he just remembers "releasing rights to sue." *Id.* He does not believe that he currently is "entitled to sue Mewbourne for unpaid overtime." *Id.* When asked whether he thought that he would be permitted to join this case if he "were to receive a notice in the mail that was approved by the Court telling [him that he was] allowed to join this case, after [he had] signed this agreement," he answered, "No, sir." *Id.* at 17.

When asked whether he felt that he "could not sign [the Release] without any risk to [his] job," he answered, "I thought there would be something. . . . I just thought it looked bad on me for Mewbourne." *Id.* When asked whether "that play[ed] a part in [him] deciding to sign [the Release]," he responded, "A small part." *Id.* Nonetheless, Ragsdale also testified that he feels

5

that $1,000 per year of service was fair compensation for his unpaid overtime.  *Id.*  Further, he testified that he "wouldn't participate" or "want to be any part" of this lawsuit, "[r]egardless of this release or not."  Doc. 101-1 at 17.

On May 23, 2019, Plaintiff filed his motion under Rule 23(b)(3) of the Federal Rules of Civil Procedure for class certification (for liability only) on his NMMWA claims, Doc. 62, which is pending before the Court.  The next day, Plaintiff filed his Motion for Corrective Notice, asking the Court to enter an order:  (1) invalidating the 55 Releases signed by Mewbourne Lease Operators; (2) restricting Defendants from communicating with putative class members about this case; (3) requiring Defendants to send out "corrective notice" to the putative class; and (4) setting a briefing schedule for a motion for Plaintiff to obtain attorney fees and costs in connection with the instant motion.  Doc. 64 at 20-21.  Thereafter, Plaintiff filed his Motion to Supplement, seeking to add to the record excerpts from Ragsdale's testimony in support of his Motion for Corrective Notice.  Defendant opposes Plaintiff's Motion for Corrective Notice and his Motion to Supplement.

## DISCUSSION

I.     Plaintiff's Motion to Supplement

As an initial matter, Plaintiff seeks to supplement the record in support of his Motion for Corrective Notice with excerpts from Ragsdale's testimony.  In response, Defendants ask the Court to either deny Plaintiff's motion or provide them with time to file a response to the supplemental evidence.  In their response brief, however, Defendants set forth no basis for the Court to reject Plaintiff's proposed supplemental evidence, and instead provide six pages of argument directly addressing the excerpts from Ragsdale's testimony.  In fact, Defendants submit with their response further excerpts of Ragsdale's testimony for the Court's

consideration. The Court thus finds no reason to deny Plaintiff's motion or to allow Defendants any further time to address Plaintiff's supplemental evidence, which, as noted, Defendants have already addressed in detail. Accordingly, Plaintiff's Motion to Supplement will be granted, and in reaching a decision on the merits of Plaintiff's Motion for Corrective Notice, this Court will consider the excerpts of Ragsdale's testimony submitted by both parties.

II.   Plaintiff's Motion for Corrective Notice

On his Motion for Corrective Notice, Plaintiff argues that Defendants' communications surrounding the settlement offers made to its current employees were coercive, misleading, and undermined the class and class counsel. As a result of these asserted improprieties, Plaintiff asks the Court to invoke its authority to issue a remedial order invalidating the releases obtained from Mewbourne's employees, directing that "corrective" notice be sent to putative class members, and awarding Plaintiff fees and costs. Defendants oppose this request, arguing that their communications were lawful and appropriate, and that Plaintiff's proposed remedial measures are "extreme and unwarranted." Doc. 72 at 2.

   A.   Standard

In *Gulf Oil Co. v. Bernard*, in the context of a Rule 23 class action, the Supreme Court held that "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." 452 U.S. 89, 100-01 (1981). And, in *Hoffman-La Roche, Inc. v. Sperling*, the Supreme Court held that a court similarly "retains authority in [an FLSA] collective action to govern the conduct of counsel and parties." 492 U.S. 165, 171 (1989). This authority encompasses the power "to limit or otherwise monitor communications between the parties and the potential class members." *Barreras v. Travelers Home & Marine Ins. Co.*, No. 12-cv-354, 2014 WL

12521456, at *1 (D.N.M. Nov. 13, 2014).

"This supervisory authority exists even before a class is certified." *Agerbrink v. Model Serv. LLC*, No. 14-cv-7841, 2015 WL 6473005, at *3 (S.D.N.Y. Oct. 27, 2015). "Indeed, the need for a district court to ensure that all parties act fairly is especially great during the early stages of FLSA litigation" before putative class members have received formal notice. *Id.* Given that such putative class members must opt into the litigation, "unsupervised, unilateral communications with [them] can sabotage the goal of the FLSA's informed consent requirement by planting the slightest seed of doubt or worry through the one-sided, unrebutted presentation of 'facts.'" *Id.*

While broad, the court's authority to limit a party's communications with putative class members "is not unlimited." *Gulf Oil*, 452 U.S. at 104. Accordingly, "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101-02. In determining "when to restrict communication with putative class members, courts evaluate the evidence of actual or threatened abuse by the party sought to be restrained." *Stransky v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d 1100, 1105 (D. Colo. 2013) (citing *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1205 (11th Cir. 1985)). "Courts have issued restrictive orders where it is found that the *ex parte* communications mislead class members, misrepresent the status or effect of the pending action, coerce prospective class members into excluding themselves from the litigation, or undermine cooperation with or confidence in class counsel." *Stransky*, 929 F. Supp. 2d at 1105 (citations omitted).

"[A] defendant's transmission of a settlement offer to a potential class member is not

inherently problematic." *Barreras,* 2014 WL 12521456, at *2. Rather, as "with all other forms of communications," a court may enter a restrictive order with regard to settlement communications "only if those communications are likely to be misleading, coercive or otherwise injurious to the proper functioning of the class [or collective] action lawsuit." *Id.* In determining whether a settlement offer is misleading, coercive, or otherwise improper, "the court focuses on the accuracy and completeness of the information contained in the offer." *Id.*

In evaluating whether a defendant's communications to potential class members are "confusing and misleading," courts "must examine the context in which the communications were made and the effect of the communications." *Id.* at 1109. Thus, the context of an existing employment relationship between the parties "is of particular concern," as such a relationship "itself may increase the risk that communications will have a coercive effect." *Id.*; *see also Mueller v. Chesapeake Bay Seafood House Assoc.*, No. 17-cv-1638, 2018 WL 1898557, at *7 (D. Md. Apr. 20, 2018) ("[I]n the context of an employee-employer relationship, there is an increased risk of coercion when the employer communicates with an employee about litigation for which the employee is a potential plaintiff."). While "the mere existence of [an employment] relationship is not enough to justify restricting the defendant's communications," such a relationship creates "[a] risk of explicit and implicit coercion" and "can transform suggestions, requests, or observations into directives or threats." *Agerbrink*, 2015 WL 6473005, at *5.

"Courts have ordered a variety of remedial measures for misleading and improper communications, including prohibiting further *ex parte* communications, issuing corrective notices, extending the opt-in period, and awarding attorneys' fees." *Stransky*, 929 F. Supp. 2d at 1109. Remedial measures "must be narrowly tailored to avoid impinging upon the parties'

constitutional rights of free speech and association." *Id*. (citing to *Gulf Oil*, 452 U.S. at 102). Generally, "an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a 'heightened sensitivity' for first amendment concerns." *Kleiner*, 751 F.2d at 1205.

    B.    <u>Instant Case</u>

Under this standard, the Court finds that certain aspects of Defendants' written and oral communications regarding their offers of settlement, considered against the backdrop of the continuing employment relationship between Defendants and the recipients of those offers, were confusing and misleading and had a potentially chilling effect on participation in this lawsuit such that narrowly tailored remedial measures are warranted. First, the Settlement Letter itself is confusing and misleading, as it fails to accurately provide putative class members with basic information about the existence of the lawsuit and the nature of the claims asserted herein. *Barreras,* 2014 WL 12521456, at * 3. Specifically, while the Settlement Letter makes reference to "a lawsuit filed by Jonathan Felps," it fails to identify the lawsuit by caption, case number, or location. Doc. 71-3. Further, while the Settlement Letter gives the recipient 10 days to consider the offer, it does not suggest that the recipient seek legal advice during that time as to the wisdom of accepting the offer. Nor does the Settlement Letter warn the recipient that signing the Release could result in the recovery of less money than pursuing litigation or even indicate the relief sought by Plaintiff. In particular, the Settlement Letter makes no mention of the fact that Plaintiff seeks liquidated damages in connection with his FLSA claims and tremble damages in connection with his NMMWA claims. The Settlement Letter also fails to identify Plaintiff's counsel, thus neither providing nor inviting access to anyone outside of Mewbourne management in the event that the recipient has questions about the offer.

Perhaps most importantly, the Settlement Letter fails to disclose that Plaintiff asserts not only claims under the NMMWA but also claims under the FLSA, fails to clarify that signing the Release would settle potential NMMWA claims but not potential FLSA claims, and fails to explain the opt-in procedures unique to FLSA claims. Indeed, the Settlement Letter states that if the Court were to certify a class action, the recipient "would be part of Jonathan Felps' lawsuit if [he or she] did nothing" – a statement that, while accurate as to Plaintiff's NMMWA claims, is inaccurate as to Plaintiff's FLSA claims. *Id.* Further, the Settlement Letter states that the settlement offer is made "in exchange for a *full* release of any claims for unpaid wage and overtime pay that [the recipient] may have under any state or local law." *Id.* In the absence of any mention of Plaintiff's FLSA claims, by discussing the opt-out procedure applicable only to NMMWA claims and referring to settlement "in exchange for a *full* release," the Settlement Letter misleadingly suggests that if the recipient chooses to sign the Release, he or she will have no further viable claims against Defendants. *Id.*

The Release enclosed with the Settlement Letter is similarly misleading. While stating in one sentence that the recipient, in exchange for a lump sum payment from Mewbourne, releases "any and all rights that [he or she] may have . . . under any state or local law, including but not limited to the [NNMWA]," a few sentences later, the Release states: "I understand that my signing of this Release will extinguish *all* unpaid wage and overtime claims . . . I may have through today's date." Doc. 71-4. By referring first to state law claims but later to "*all* unpaid wage and overtime claims," the Release is at best confusing and at worst misrepresents the scope of the recipient's agreement to settle.

Read together, the Settlement Letter and the Release are likely to mislead the recipient into mistakenly believing that the only claims at issue in this case are NMMWA claims, that no

11

action is required on his or her part to participate in Plaintiff's claims, and that accepting the settlement offer would result in the release of all possible claims against Defendants, thereby "sabotage[ing] the goal of the FLSA's informed consent requirement." *Agerbrink*, 2015 WL 6473005, at *3. It follows that any recipient who ultimately signed a Release would reasonably yet mistakenly believe that he or she is not entitled to participate in this litigation for any purpose and thus would not take the affirmative steps necessary to opt into this action, thereby inadvertently forgoing the opportunity to recover against Defendants for their alleged violations of the FLSA.

Indeed, that is the very belief held by Ragsdale, a current Mewbourne employee who was presented with the Settlement Letter and signed the Release. Specifically, Ragsdale testified that he understood that, in signing the Release, he was "releasing [his] right to sue based on overtime wages." Doc. 100-2 at 12. He had no understanding that he was releasing only certain of his claims, but rather believed that he was "releasing [his] rights to sue." His current understanding is that, as a result of the Release, he is no longer "entitled to sue Mewbourne for unpaid overtime." *Id.* When specifically asked whether he thought that he would be permitted to join this case if he "were to receive a notice in the mail that was approved by the Court telling [him that he was] allowed to join this case, after [he had] signed this agreement," he answered, "No, sir." *Id.*

Admittedly, Ragsdale also testified that, had he not released his claims against Defendants, he still would not choose to participate in this action, and that he feels that he was fairly compensated through his settlement with Defendants. Doc. 101-1 at 17. That testimony has no bearing, however, on the relevant fact that, based on Defendants' communications, Ragsdale developed the mistaken understanding that he had released all of his claims against

12

them.   Ragsdale's testimony thus provides concrete evidence that the Settlement Letter and the Release were likely to mislead recipients into the mistaken belief that, by signing the Release, they had bargained away the right to opt into this litigation for purposes of joining Plaintiff's FLSA claims, thereby having a chilling effect on participation in this lawsuit.

Indeed, the potentially chilling effect of the Settlement Letter and the Release is compounded by the fact that the recipients of these communications were current employees of Mewbourne, "economically dependent on the [D]efendants."   *Agerbrink,* 2015 WL 6473005, at * 5.   In light of the employer-employee relationship between Defendants and the recipients of the Settlement Letter, "it is reasonable to infer that at least some felt coerced to sign it." *Mueller*, 2018WL1898557, at *8.   This inference is all the more reasonable given the factual circumstances in which the Settlement Letter was presented to employees.

Specifically, Lacy, the "Production Superintendent," personally contacted and had individual telephone conversations with each of the 56 employees to whom offers would be extended.   Doc. 71-5 ¶6.   Thereafter, Terrell, the "District Superintendent," announced at a meeting that was *mandatory* for all employees that those individuals who had been contacted by Lacy "could pick up an envelope from the office's reception desk after the meeting."   Doc. 71-2 ¶ 6.   These oral communications by two members of Mewbourne's management reasonably conveyed to their subordinates Mewbourne's desire that its employees settle potential claims against it.   Indeed, the Settlement Letter itself confirms this desire, as Lacy not only writes to his subordinates that Mewbourne – their employer – hopes [the recipient] will accept this offer," but also reiterates that *he himself* "hope[s] that [the recipient] will thoughtfully consider this letter."   Doc. 71-3.   In the context of their existing employment relationship, employees who had been contacted by Lacy and then read this language in his Settlement Letter reasonably

13

could have interpreted these "hopes" as directives.  *See Agerbrink*, 2015 WL 6473005, at *5 (explaining that the existence of an employment relationship creates "[a] risk of explicit and implicit coercion" and "can transform suggestions, requests, or observations into directives or threats").

Admittedly, there is also language in the Settlement Letter that the recipient's "relationship with Mewbourne will be <u>completely unaffected</u> by [the recipient's] acceptance or rejection of this settlement offer," that whether the recipient accepts the offer "is completely up to" the recipient, and that this is a "<u>voluntary process</u>."  Doc. 71-3.  In light of the clearly expressed hope of both Lacy, as a supervisor, and Mewbourne, as the employer, that the recipients accept their settlement offer, however, these assurances reasonably may have rung hollow.

Indeed, Ragsdale's testimony lays bare the coercion implicit in Defendants' communications.  When asked whether he felt that he "could not sign [the Release] without any risk to [his] job," he answered, "I thought there would be something. . . . I just thought it looked bad on me for Mewbourne."  Doc. 100-2 at 12.  And while this was not the only factor in his decision to accept Defendants' offer, Ragsdale testified that the fear of retaliation for declining the offer played "[a] small part" in his decision to sign the Release.  *Id.*

Further, the Settlement Letter glosses over the nature of the potentially adverse interests of Mewbourne, on the one hand, and its employees, whom they describe as part of "the Mewbourne team," on the other.  Doc. 71-3.  For example, the Settlement Letter explains that Defendants' decision to extend "offer[s] of compromise to compensate" Mewbourne's lease operators was made "[i]n an effort to minimize ongoing costly and time-consuming litigation."  *Id.*  The Settlement Letter, however, fails to indicate *whose* litigation costs will be minimized

by settlement, or what potential compensation the employees would be forfeiting by accepting Defendants' settlement offer.   In the absence of any clarification as to who stands to gain and lose by avoiding litigation, and in light of the ongoing employment relationship between the parties, Defendants' settlement communications reasonably (yet inaccurately) might have conveyed that their employees' interests were aligned with those of their employer, or that Mewbourne had only their employees' best interest at heart.   *See Agerbrink*, 2015 WL 6473005, at *5 ("[P]otential opt-in plaintiffs may be inclined to defer to the defendants because of the nature of the relationship.)".

Accordingly, under all of the circumstances, Defendants' oral and written settlement communications were confusing and misleading and had a potentially chilling effect on participation in this lawsuit.   It thus is appropriate for this Court to fashion remedial measures to dispel any confusion or misunderstandings and to ensure participation in the lawsuit by those who otherwise would want to participate, while at the same time carefully guarding Defendants' First Amendment rights.   *Barreras,* 2014 WL 12521456, at * 3 (explaining that the court must fashion the "narrowest possible relief [that] would protect the respective parties").

To that end, the Court will restrict Defendants from communicating with putative class members about this action or the claims or defenses raised herein, for purposes of settlement or otherwise, without first submitting such communications to the Court for review.   Further, Plaintiff shall be permitted to revise the Notice and Consent that the Court ordered to be issued in its May 2020 Opinion to clarify that Plaintiff is pursuing claims under both the NMMWA and the FLSA, that any settlement proposed by Defendants thus far applies only to Plaintiff's NMMWA claims and not to his FLSA claims, that regardless of whether a putative class member signed a Release, he or she is eligible to opt into this FLSA collective action, and that by failing

to affirmatively opt into the action (by measures that should be outlined in the Notice), he or she will lose that eligibility and may lose the right to recover at all on his or her FLSA claims as a result of the applicable statute of limitations. The Notice should also clearly advise the putative class members as to the relief Plaintiff requests in connection with his FLSA claims. Finally, the Notice should explain in detail that, regardless of any continuing employment relationship between Defendants and their employees and any interest that Defendants may have in settling rather than litigating Plaintiff's claims, any retaliation by Defendants against its employees for taking part in this lawsuit is absolutely prohibited by law.

While troubled by the Settlement Letter and the Release for the reasons outlined above, the Court is not inclined to invalidate Releases that have already been executed by potential class members. Courts that have confronted this issue "have generally held that it is inappropriate to unilaterally invalidate such releases." *Tolmasoff v. Gen. Motors, LLC*, No. 16-cv-11747, 2016 WL 3548219, at *15 (E.D. Mich. June 30, 2016). As an initial matter, "it is not obvious that Rule 23(d) authorizes a court to unilaterally void executed releases." *Id.* Moreover, "it is inappropriate for a court to void releases without first knowing whether those who executed the releases *want* the releases to be voided." *Id.* (emphasis in original). For these reasons, "courts have held that the appropriate solution is to wait until after the class is certified and then include a statement in the class-action notice stating that the court will entertain applications to void any releases previously signed." *Id.* The Court adopts this approach here. *See Jin Nakamura v. Wells Fargo Bank, Nat'l Assoc.*, No. 17-cv-4029, 2018 WL 994706, at *9 (D. Kan. Feb. 21, 2019). Accordingly, in the event that this Court grants certification of a class for purposes of Plaintiff's NMMWA claims, any individual who signed a Release will be notified of the right to invalidate that Release and to participate in this action for purposes of pursuing NMMWA claims

against Defendants.

Finally, the Court does not find it proper to award attorney's fees at this juncture. In support of his request for attorney's fees, Plaintiff cites to *Stransky*. In *Stransky*, however, the Court found that the defendant had violated a court order and had "intentionally attempted to undermine the Court-approved notice." 929 F. Supp. 2d at 1110. It was for this reason, and for the express purpose of "punish[ing] violations of its orders," that the Court awarded fees and costs. *Id.* Here, Defendants' communications, while improper, did not similarly violate any orders of this court. Because the impropriety of Defendants' communications here was much less extreme than that of the defendants in *Stransky*, there is no similar basis or purpose for punishing Defendants by ordering them to pay attorney's fees.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff's supplemental evidence, in addition to Defendants' supplemental evidence, should be considered by the Court. The Court further finds that, in considering that evidence, in addition to the briefing and additional evidence submitted by the parties, Defendants' oral and written settlement communications were confusing and misleading and had a potentially chilling effect on participation in this lawsuit such that narrowly tailored remedial measures are necessary.

**IT IS THEREFORE ORDERED** that Plaintiff's Opposed Motion for Leave to File Supplemental Evidence in Support of His Emergency Motion for Corrective Notice [Doc. 100] is **GRANTED.**

**IT IS THEREFORE FURTHER ORDERED** that Plaintiff's Emergency Motion for Corrective Notice, to Prohibit Class Communications by Defendants, to Set Aside Settlement Agreements, and For Fees and Costs [Doc. 64] is **GRANTED IN PART**, as follows:

(1) Defendants are restricted from communicating with putative class members about this action or the claims or defenses raised herein, for purposes of settlement or otherwise, without first submitting such communications to the Court for review.

(2) Plaintiff shall be permitted to revise the Notice and Consent that the Court ordered to be issued in its May 18, 2020 Memorandum Opinion and Order [Doc. 111] to clarify that Plaintiff is pursuing claims under both the NMMWA and the FLSA, that any settlement proposed by Defendants thus far applies only to Plaintiff's NMMWA claims and not to his FLSA claims, that regardless of whether a putative class member signed a Release, he or she is eligible to opt into this FLSA collective action, and that by failing to affirmatively opt into the action (by measures that should be outlined in the Notice), he or she will lose that eligibility and may lose the right to recover at all on her or her FLSA claims as a result of the applicable statute of limitations.   The Notice should also clearly advise the putative class members as to the relief Plaintiff requests in connection with his FLSA claims.   Finally, the Notice should explain in detail that, regardless of any continuing employment relationship between Defendants and their employees and any interest that Defendants may have in settling rather than litigating Plaintiff's claims, any retaliation by Defendants against its employees for taking part in this lawsuit is absolutely prohibited by law.

(3) In the event that this Court grants certification of a class for purposes of Plaintiff's NMMWA claims, any individual who signed a Release will be notified of the right to invalidate that Release and to participate in this action for purposes of pursuing NMMWA claims against Defendants.

DATED this 15th day of July 2020.

_____
MARTHA VÁZQUEZ
United States District Judge