## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

JONATHAN FELPS, Individually and
On Behalf of All Others Similarly Situated,

     Plaintiffs,

v.                                 No. CIV 18-811 MV/GJF

MEWBOURNE OIL COMPANY, INC.
and D. Drew Greene,

       Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Plaintiff's Motion for Class Certification for Liability Only under Rule 23(b)(3) ("Motion for Class Certification") [Doc. 62].   The Court, having considered the motion and relevant law, finds that the Motion for Class Certification is well-taken and will be granted.

### BACKGROUND

Mewbourne Oil Company is an oil and gas production company doing business in New Mexico, Oklahoma, and Texas.   Doc. 36 ¶ 16.   From 2014 to October 2016, Plaintiff Jonathan Felps worked as a Lease Operator, or Pumper, for Mewbourne at its Hobbs, New Mexico location.   *Id.* ¶¶ 17-18.   All of Mewbourne's Lease Operators perform the same job duties, namely, outdoor manual labor, including operating oilfield equipment, inspecting and maintaining oilfield equipment, monitoring oilfield equipment, and collecting and relaying data to supervisors for analysis.   *Id.* ¶ 25.

In August 2016, the United States Department of Labor ("DOL") commenced an investigation into Mewbourne's practices of classifying its employees, through which it

determined that Mewbourne had been misclassifying its Lease Operators as exempt from the overtime protections of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. *Id*. ¶ 57. Based on this misclassification, all Lease Operators employed by Mewbourne, including Plaintiff, were paid only a base salary and received no additional compensation for hours worked in excess of 40 hours a week. *Id*. ¶ 23.

As a result of the DOL investigation, Mewbourne made back-wage payments to 53 of its Lease Operators and obtained DOL-approved releases from them. Doc. 12 at 5. Further, in October 2016, Mewbourne reclassified its Lease Operators as hourly, non-exempt employees entitled to overtime. Doc. 36 ¶ 58. It was not until June 21, 2017, however, that Mewbourne began paying its Lease Operators overtime for hours worked in excess of 40 hours a week. Doc. 44 at 2-3.

Plaintiff, who did not receive any funds as a result of the DOL investigation and did not sign any release of claims, Doc. 36 ¶ 61, commenced this action "individually and on behalf of all others similarly situated" against Mewbourne and Drew Greene, Mewbourne's General Manager of Administration (collectively, "Defendants"), asserting violations of both the FLSA and the New Mexico Minimum Wage Act ("NMMWA"), which, like the FLSA, requires that employees who work more than 40 hours in a week be paid one and one-half times their regular hourly rate for hours worked in excess of 40 hours. Doc. 36. Thereafter, Plaintiff filed a motion seeking conditional certification of an FLSA collective action [Doc. 12], which he later amended [Doc. 44]. On May 18, 2020, the Court entered a Memorandum Opinion and Order ("May 2020 Opinion") granting Plaintiff's amended motion for conditional certification of an FLSA collective action, conditionally certifying a class of "all persons who worked as a Lease

Operator or Pumper for Mewbourne at any time between October 31, 2015 and June 21, 2017." Doc. 111.

In early May of 2019, Mewbourne presented a "Confidential Settlement Communication" (the "Settlement Letter") to 56 of its employees, offering to pay each of them "$1,000 per year of employment as a lease operator with Mewbourne, through June 30, 2017, in exchange for a full release of any claims for unpaid wages and overtime pay that [such employee] may have under any state or local law," Doc. 71-3, along with a Settlement Agreement and Release ("Release"). Doc. 71-4.   Of the 56 employees who were presented with a Settlement Letter, 55 individuals signed a Release.   Doc. 71-2 ¶ 11.

On May 24, 2019, Plaintiff filed a Motion for Corrective Notice, Doc. 64, asking the Court to enter an order, *inter alia*, invalidating the 55 Releases signed by Mewbourne Lease Operators.   On July 15, 2020, the Court entered a Memorandum Opinion and Order ("July 2020 Opinion") in which the Court held in part that, because Defendants' oral and written settlement communications were confusing and misleading, in the event that this Court grants certification of a class for purposes of Plaintiff's NMMWA claims, any individual who signed a Release will be notified of the right to invalidate that Release and to participate in this action for purposes of pursuing NMMWA claims against Defendants.

On May 23, 2019, Plaintiff filed the instant motion under Rule 23(b)(3) of the Federal Rules of Civil Procedure for class certification (for liability only) on his NMMWA claims. Doc. 62.   Specifically, Plaintiff asks the Court to certify a class of "all of Defendants' current and former Lease Operators who, in at least one workweek between June 19, 2009 and June 21, 2017, were paid a salary with no overtime and who worked for Defendants in New Mexico." *Id.* at 3.   Defendants oppose Plaintiff's Motion for Class Certification.

3

## DISCUSSION

The crux of Plaintiff's NMMWA claim is that Defendants' policy of classifying Lease Operators as exempt from the overtime wage protections of the NMMWA resulted in Plaintiff and proposed class members losing out on overtime wages, *i.e.*, one and one-half times their regular wage, for any time over 40 hours that they worked in any given workweek.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff asks the Court to certify a class in connection with this claim, arguing that the necessary certification requirements are met and that a class can properly be certified for liability purposes only.   Although Defendants admit that they classified all Lease Operators as exempt from the NMMWA's overtime wage protections and, as a result, did not pay Plaintiff or proposed class members any overtime wages, Defendants argue that Plaintiff does not meet Rule 23's requirements and that class certification, for liability purposes or otherwise, thus would be improper.

I.   Standard for Class Certification under Rule 23

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).   "Rule 23 sets forth the standards for certifying a class action and requires that all four prerequisites of Rule 23(a) and at least one of the three prerequisites of Rule 23(b) are satisfied."   *Casias v. Distrib. Mgm't Corp, Inc.,* No. 11-cv-874, 2014 WL 12710236, at *3 (D.N.M. Mar. 31, 2014) (citing *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613-14(1996)).

Rule 23(a) requires that the party seeking certification demonstrate that: (1) "the class is so numerous that joinder of all members is impracticable" (numerosity); (2) "there are questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and (4) "the

representative parties will fairly and adequately protect the interest of the class" (adequacy).

Fed. R. Civ. P. 23(a).    A plaintiff "must also satisfy through evidentiary proof at least one of the

provisions of Rule 23(b)."    *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).    The provision

at issue here is Rule 23(b)(3), which requires the Court to find that: (1) "the questions of law or

fact common to class members predominate over any questions affecting only individual

members" (predominance); and (2) "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy" (superiority).    Fed. R. Civ. P. 23(b)(3).

    Additionally, Rule 24(c)(4) allows, "[w]hen appropriate," for a class to be certified "with

respect to particular issues" only.    Fed. R. Civ. P. 23(c)(4).    Under this provision, in order "to

preserve the class action model in the face of individualized damages, . . . at the outset, a class

may be certified for liability purposes only, leaving individual damages calculations to

subsequent proceedings."    *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*,

725 F.3d 1213, 1220 (10th Cir. 2013) (quoting *Comcast*, 569 U.S. at 41 n.* (Ginsburg, J. and

Beyer, J., dissenting)).

    "Rule 23 does not set forth a mere pleading standard."    *Dukes*, 564 U.S. at 350.

Rather, "[a] party seeking class certification must affirmatively demonstrate his [or her]

compliance with the Rule – that is, he [or she] must be prepared to prove that there are *in fact*

sufficiently numerous parties, common questions of law or fact, etc."    *Id.* (emphasis in

original).    Further, "a court's class-certification analysis must be 'rigorous' and may 'entail

some overlap with the merits of the plaintiff's underlying claim.'"    *Amgen Inc. v. Conn. Ret.*

*Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Dukes*, 564 U.S. at 351).

Nonetheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the

certification stage."    *Amgen*, 568 U.S. at 466.    Rather, "[m]erits questions may be considered

to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."   *Id.*

II.   The Instant Case

Here, Defendants appear to concede that Plaintiff meets the latter two requirements of Rule 23(a), namely, typicality and adequacy of representation, but contend that Plaintiff fails to satisfy the first two requirements of that subsection, namely, numerosity and commonality. Defendants further contend that Plaintiff satisfies neither the predominance requirement nor the superiority requirement of Rule 23(b).   After a rigorous analysis, the Court finds that Plaintiff has satisfied his burden of affirmatively demonstrating that the Rule 23 prerequisites exist in fact.

A.   Disputed Rule 23(a) Requirements

1.   Numerosity

In order to meet the numerosity requirement of Rule 23(a)(1), "[t]he burden is upon plaintiffs seeking to represent a class to establish that the class is so numerous as to make joinder impracticable."   *Treviso v. Adams,* 455 F.3d 1155, 1162 (10th Cir. 2006) (citation omitted). The Tenth Circuit "has never adopted [] a presumption" of numerosity at a certain number, but rather has "specifically stated there is no set formula to determine if the class is so numerous that it should be so certified."   *Id.*   "Impracticability is dependent not on any arbitrary limit but upon the circumstances surrounding the case."   *Horn v. Assoc. Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977).   Notably, "because it is such a fact-specific inquiry," the district court has "wide latitude" in determining whether the numerosity requirement has been met. *Treviso*, 455 F.3d at 1162.   Circumstances that may inform the court's impracticability determination include, *inter alia*, "geographical dispersion, degree of sophistication, and class

6

members' reluctance to sue individually." *Amezguita v. Dynasty Insulation, Inc.*, 10-cv-1153, 2012 WL 12973895, at *4 (D.N.M. Feb. 23, 2012).

The parties disagree as to the number of potential class members. Defendants argue that, based on their calculations, Mewbourne employed only 60 Lease Operators during the relevant period, 55 of whom have voluntarily released their claims, resulting in a potential class of merely five members. Doc. 68 at 17. On the other hand, Plaintiffs argue that, based on various forms of evidence including Defendants' own admissions, there are at least 100 potential class members. Doc. 79 at 5-7. As the Court made clear in its July 2020 Opinion, upon certification of a class, any individual who signed a Release will be notified of the right to invalidate that Release and participate in this action for purposes of pursuing NMMWA claims against Defendants. Accordingly, by Defendants' own account, the number of potential class members is at least 60.

Also by Defendants' own account, the majority of potential class members remain employed by Mewbourne. Doc. 68 at 17. Given their relationship with Defendants, there is a strong likelihood that those potential class members would be reluctant to individually sue or join in an individual suit against Defendants. "In employment actions like this one, a class member's potential fear of retaliation is an important consideration in deciding whether joinder is impracticable and thus whether the numerosity requirement is satisfied." *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 183 (S.D. Ohio 2012). Indeed, courts across many districts have certified smaller classes (less than 40 members) and are "particularly conservative with the numerosity requirements in certifying employment cases where there is a prevalent fear of employer retaliation." *Fenley v. Wood Group Mustang, Inc.*, 325 F.R.D. 232, 249 (S.D. Ohio 2018) (collecting cases).

As Defendants note, Plaintiff has not established geographic diversity, which would favor a finding of numerosity. Geographic diversity, however, is but one factor to consider, and the lack of such diversity is not dispositive of the impracticability determination. The undisputed evidence demonstrates that there are at least 60 potential class members, and that most of those class members remain employed by Mewbourne. Under these circumstances, the Court finds that Plaintiff has met his burden of establishing impracticability of joinder, and thus numerosity, in satisfaction of Rule 23(a)(1).

2.     Commonality

Commonality requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). While "[a]ny competently crafted class complaint literally raises common questions," simply reciting "these questions is *not* sufficient to . . . demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 349-50 (citations omitted; emphasis in original). Rather, the class members' claims must "depend upon a common contention," and in turn, that common contention must be "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue . . . in one stroke." *Id.* at 350. Thus, in determining commonality, "[w]hat matters" is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original; citation omitted). "Despite the rigor of the Rule 23 requirements, commonality has never been understood to require that all issues must be identical as to each member, but rather requires that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 414 (S.D.N.Y. 2013) (citation omitted).

Notably, "the weight of authority rejects the argument that *Dukes* bars certification in

wage and hour cases." *Morris v. Affinity Health Plan, Inc.,* 859 F. Supp. 2d 611, 616 (S.D.N.Y

2012) (collecting cases).   Rather, in the context of cases "that challenge employment policies,

courts considering whether a proposed class satisfies the commonality requirement must []

examine whether the challenged policy is common to the class as a whole, and whether the

proposed class members share similar job duties."   *Gandy v. RWLS, LLC*, 17-cv-558, 2019 WL

1407214, at *6 (D.N.M. Mar. 28, 2019) (citing *Dukes*, 564 U.S. at 359 (finding that a nationwide

class of employees could not show commonality in a discrimination suit because the plaintiffs

"provide[d] no convincing proof of a companywide discriminatory pay and promotion policy"

that [was] applicable to all class members)); *see also Morris v. Alle Processing Corp.*, 08-cv-

4874, 2013 WL 1880919, at *9 (E.D.N.Y. May 6, 2013) (noting that, in wage and hour cases,

courts have "focused on whether the employer had company-wide wage policies that injured the

proposed class") (citation omitted).   After engaging in such analysis, "[c]ourts routinely certify

misclassification cases," finding that "the central question of whether the employees were

wrongfully classified as exempt from overtime pay requirements is common to the class."

*Swigart*, 288 F.R.D. at 184 (collecting cases); *see also Fitzgerald v. P.L. Mkting, Inc.*, No 17-cv-

2251, 2020 WL 3621250, at *7 (W.D. Tenn. July 2, 2020) ("The members of the Classes present

common questions of law and fact about whether PLM misclassified them as salaried, non-

exempt employees"); *Flores v. Anjost Corp,* 284 F.R.D. 112, 125 (S.D.N.Y. 2012) ("Claims by

workers that their employers have unlawfully denied them wages to which they were legally

entitled have repeatedly been held to meet the commonality prerequisite for class certification.");

*Jacob*, 289 F.R.D. at 415 (concluding that plaintiffs sufficiently established commonality given

"the uniform classification" of assistant store managers ("ASM") "as exempt" from the overtime

wage protections of New York law, "the uniform description of ASM's duties, the similarity

9

among [Duane Reade] stores, and the discrete, geographical location of the [Duane Reade] brand"); *Laichev v. JBM, Inc.*, 269 F.R.D. 633, 640 (S.D. Ohio 2008) (finding commonality when "the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation").

Here, Plaintiff has identified a policy and practice – classifying Lease Operators as exempt – that he alleges Defendants knowingly employed with the effect of causing Plaintiff and the potential class members to be undercompensated in violation of the NMMWA.   The fact that Defendants uniformly applied this policy and practice to its Lease Operators is undisputed. *See* Doc. 68 at 14 ("[T]he misclassification issue is not in dispute.").   It is also undisputed that, because of this policy and practice, Defendants did not compensate Lease Operators for overtime.   *See id.* at 15 ("Mewbourne and Greene have admitted that they did not pay an overtime premium to lease operators.").   Further, Declarations submitted by Plaintiff and other former Mewbourne Lease Operators demonstrate that Lease Operators' work required more than 40 hours a week.   *See, e.g.*, Doc. 62-1 ¶ 6 (Declaration of Tyson Fletcher) ("I almost always worked more than forty hours per week and frequently worked more than 50 hours in a week."); Doc. 62-2 ¶ 7 (Declaration of Ross Menefee) ("I almost always worked more than forty hours per week and frequently worked more than 60-70 hours in a week."); Doc. 62-4 ¶ 7 (Declaration of Danny Stark) ("I almost always worked more than forty hours per week and frequently worked 80 or more hours in a week.").   Similarly, these Declarations establish that "Mewbourne scheduled [Lease Operators'] work hours and [their] supervisors knew how many hours [they] were working per week."   *See, e.g.*, Doc. 62-1 ¶ 7; *see also* Doc. 62-3 ¶ 8 (Declaration of Doug Thompson) ("I informed my supervisors about the amount of time it was taking me to complete the assigned routes.   And on one occasion, my supervisor, Matt Gandy,

10

rode along with me on my route."); Doc. 62-4 ¶ 8 (Stark Decl.) ("I was communicating with my supervisors regularly, including late into the night after I finished my route," and also entered "well data" into a computer program, which "typically took two hours per day . . . after I finished my route."); Doc. 62-7 ¶ 8 (Declaration of Jeffery Fraley) ("I complained to my supervisor about working long hours without being paid any overtime."); Doc 62-6 ¶ 11 (Declaration of Justin Levario) ("[A]s a Lead Pumper, we knew the number of hours per week the Lease Operators were working and knew they were working more than forty hours per week. . . . Mewbourne had access to whatever Lease Operators entered into the [computer] system and would tell when Lease Operators entered it.").

Plaintiff's claim ultimately rests on the contention that the policy and practice of classifying Lease Operators as exempt – together with the standard practice of assigning more work than the Lease Operators could complete within 40 hours a week – "had the effect of causing the class to perform uncompensated work."   *See Perez v. Isabella Geriartic Center, Inc.*, No. 13-cv-7453, 2016 WL 5719802, at *2 (S.D.N.Y. Sept. 30, 2016).   The common question that is "likely to drive the resolution of the litigation [is] therefore whether the confluence of these policies and practices can establish, on a classwide basis," that: (a) Plaintiff and the potential class members worked more than 40 hours a week, (b) management knew or should have known that they did so, and (c) they were not compensated for the overtime.   *Id.*; *see Self v. United Parcel Service, Inc.*, 970 P.2d 582, 589 (N.M. 1998) (setting forth the elements of an NMMWA claim).   At this stage, "[t]he Court need not reach the merits of [this]common question[]."   *Perez*, 2016 WL 5719802, at *2.   Rather, it is enough that the policy and practice that serve as the basis for Plaintiff's claims have "been shown to apply uniformly to the putative class."   *Id.* (citing *Lassen v. Hoyt Livery Inc.*, No. 13-cv-1529, 2014 WL 4638860, at *9 (D.

Conn. Sept. 17, 2014) (finding commonality where it was "not disputed . . . that all members of the putative class were subject to a uniform compensation policy . . . the legality or illegality of [which] provide[d] the unifying thread to satisfy the commonality requirement of Rule 23(a)(2)).").

In short, "the common contention of the class members in the instant case is that they were not properly compensated for overtime hours" because Defendants misclassified them as exempt from the NMMWA's overtime requirements. *Chado v. Nat'l Auto Inspections, LLC*, 17-cv-2945, 2019 WL 1981042, at *5 (D. Md. May 3, 2019). "If that is true, then every member of the class is entitled to a recomputation of compensation based upon actual hours worked." *Id.* Accordingly, Plaintiff has satisfied the commonality requirement of Rule 23(a)(2) by demonstrating that his claims rest on a common contention the determination of which "will resolve an issue . . . in one stroke." *Dukes*, 564 U.S. at 350.

Defendants disagree, arguing that in order "[t]o establish Mewbourne's liability or lack thereof for any pumper for any workweek, the Court would have to examine the available evidence showing how many hours that pumper worked that week, and because Mewbourne is liable to a Lease Operator only if he or she "worked over 40 hours" in a given week, "[t]here is no way around this individual analysis." Doc. 68 at 12. According to Defendants, the factual variation in the actual hours worked by each class member suffices to unravel the unifying thread of the class members' claims.

Courts, however, routinely reject the argument that commonality is defeated by "individualized questions regarding the number of hours worked and how much each employee was entitled to be paid," reasoning that those "differences go to the damages that each employee is owed, not to the common question of Defendant's liability." *Swigart*, 288 F.R.D. at 184

(citation omitted); *accord, Morris,* 2013 WL 1880919, at *10 ("Differences among class members as to the number of hours worked, the type of work performed, and the amount of pay received concern the amount of damages to which any individual class member might be entitled if and when liability is found, not the amenability of plaintiffs' claims to the class action form.") (citation omitted); *Chado*, 2019 WL 1981042, at *5 (holding that defendants' argument that every class member's "hours will differ, thereby making a class action unsuitable," fell "short," as it failed "to recognize that the policy of compensation was applied across the board to all Specialists, thereby allegedly shortchanging all of them"); *Gomez v. PNC Bank, NA*, 306 F.R.D. 156, 168-69 (N.D. Ill. 2014) (rejecting defendant's argument that plaintiff could not satisfy the commonality requirement because the court would be "required to engage in a highly factual, individualized analysis to determine whether Plaintiff [was] overtime eligible, whether she [was] in fact owed additional overtime, and, if so, how much," finding instead that whether the defendant had a "policy of not compensating its employees for time they work beyond 40 hours a week . . . [was] relevant to the extent of [the defendant's] liability, if any, under state and federal overtime laws," and that it was "more efficient to answer this question . . . in one stroke on a class-wide basis.").    Recently, in *Rodriguez v. Peak Pressure Control, L.L.C.*, the plaintiff argued, just as Plaintiff does here, that the entire class of pressure control operators was misclassified as exempt from the NMMWA's overtime requirements and, as a result, was paid salary with no overtime pay, which in turn resulted in the lack of compensation for hours worked in excess of 40 hours per week.    17-cv-576, 2020 WL 3000415, at *1 (D.N.M. June 4, 2020). The defendants in *Rodriguez*, just as Defendants do here, argued that commonality was defeated (in part) because "answering the question of whether the class members worked in excess of 40 hours in a workweek in New Mexico will require individualized evidence of each member's

workweek in New Mexico."   *Id.* at *6.   This Court rejected that argument, noting that

defendants "uniformly" classified class members as exempt from NMMWA's overtime

requirements "without making an individualized determination of each worker's individual

responsibilities," and that "every member of the class need not be in a situation identical to that

of the named plaintiff."   *Id.* at *7.

Defendants have pointed to no persuasive authority to convince the Court to hold any

differently here.   Defendants cite to *Gandy*, in which the plaintiff claimed that the defendant

oilfield service company misclassified its "field employees" as exempt from overtime and paid

them on a salary plus bonus basis without overtime compensation in violation of the NMMWA.

2019 WL 1407214, at *1.   Unlike the class in the instant case, which is comprised solely of

Lease Operators to whom Mewbourne applied the same exemption, the putative class of

employees in *Gandy* "encompasse[d] seven different job titles" and the defendants asserted that

"they applied three different NMMWA exemptions to the class members."   *Id.* at *8.   And

unlike Defendants here, who concede that its Lease Operators were, as a uniform policy and

practice, *misclassified* as exempt, the defendant in *Gandy* maintained that it had *properly applied*

the various NMMWA exemptions, and that "evidence regarding which exemption applie[d] to

each class member [would] require an assessment of each class member's job duties."   *Id.* at *7.

Because the plaintiff had "not provide[d] evidence of company-wide policies regarding

employee classification or overtime pay," and because the class members' job descriptions did

"not establish that the class members had similar job duties," the *Gandy* Court found that

"determining whether the NMMWA exemptions appl[ied] [would] involve fact-specific inquiries

regarding the employees' specific job duties," and thus that the plaintiff had "not satisfied his

burden of showing [that] this question is capable of class-wide resolution."   *Id.* at *9.

In contrast, it is undisputed here that Mewbourne's Lease Operators had similar job duties and were uniformly misclassified as exempt.   Doc. 68 at 14.   Because there is no question as to whether any of the class members were properly classified as exempt, it follows that there is no need for a fact-specific inquiry to determine the applicability of any exemptions. The reasoning of *Gandy*, which rested on the necessity of a fact-specific inquiry that is not needed here to answer a question that is not in dispute here, thus is inapposite.

The *Gandy* Court did go on to consider an additional argument raised by the defendants, similar to that raised by Defendants here, that, "to answer the question of whether the class members worked in excess of 40 hours in a workweek," the court would "have to consider individual evidence such as driver's logs and job tickets," and that, as a result, this question was also not "capable of class-wide resolution."   2019 WL 1407214, at *9.   In agreeing with defendants, the Court relied on *Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, 310 F.R.D. 631 (D.N.M. 2015).   The *Gandy* Court cited language in *Bustillos* that "'if employees failed to record pre-shift or post-shift time, this determination [would] be subject to speculation and individual accounts,'" and thus "'the proposed class presented questions requiring individual assessments and significant testimony.'"   *Gandy*, 2019 WL 1407214, at *9 (quoting *Bustillos*, 310 F.R.D. at 671).   The *Gandy* Court stated that the *Bustillos* Court "declined to certify the class under Rule 23(b)(3)" on this basis.   *Gandy*, 2019 WL 1407214, at *9 (quoting *Bustillos*, 310 F.R.D. at 671).   Finding "no difference" between *Bustillos* and the case before it, the *Gandy* Court determined that the potential need for individual evidence in calculating the number of hours each class member worked provided a second basis for finding that the plaintiff had not met the commonality requirement.   *Id.*

This Court does not agree that *Bustillos* supports a finding that commonality is defeated

by individualized questions regarding the number of hours worked by each class member.   To the contrary, the Court in *Bustillos* held that the plaintiffs *did* satisfy Rule 23(a)'s commonality requirement, because "[t]he fundamental issue . . . common among all of the Plaintiffs and potential plaintiffs" was "whether Hidalgo County required potential class members to perform uncompensated work."   310 F.R.D. at 670.   In making this determination, the Court specifically rejected the notion adopted by the *Gandy* Court that the possibility that "Plaintiff and potential class member[s] might have performed a different amount of uncompensated work" would "preclude the Plaintiffs from satisfying the commonality [] element[]."   *Id.*   The Court reasoned that "[e]ven though some plaintiffs may be entitled to more damages than others, all of the Plaintiffs' and proposed class members' claims are based on the same legal theory – that they performed uncompensated work."   *Id.*   The court concluded that "[a]ll of the Plaintiffs and proposed class members share this with each other, thus satisfying the commonality requirement."   *Id.*

Indeed, the language cited by the *Gandy* Court to support its own commonality determination was written in the wholly separate context of the *Bustillos* Court's consideration of Rule 23(b)(3)'s predominance requirement.   *Id.* at 671.   And even in that context, after noting the "difficulties" posed by the fact that, if employees had failed to record overtime, determining their uncompensated hours would be "subject to speculation and individual accounts," the Court still found that common questions of law and fact predominated over questions affecting individual members.   *Id.* at 671.   Ultimately, the *Bustillos* Court denied the plaintiffs' motion to certify on the unrelated basis that the plaintiffs had not met Rule 23(b)(3)'s requirement that a class action be the superior method to try the case.   *Id.* at 673.

As in *Bustillos*, in this case the fundamental issue common among Plaintiff and the class

16

members is whether, by misclassifying their Lease Operators as exempt, Defendants required them to perform uncompensated work.   And as the Court found in *Bustillos*, this Court, too, finds that differences in the amount of uncompensated work that Plaintiff and potential class members might have performed does not preclude Plaintiff from satisfying the commonality element.   The Court respectfully declines to adopt the *Gandy* Court's contrary determination that commonality is defeated by the potential variation in hours worked by individual class members.

The Court equally declines to adopt Defendants' reasoning that, because they have conceded many of the common issues raised by Plaintiff, namely, that the class members were misclassified as exempt, performed the same job duties, and were not paid overtime, these issues cannot be considered common for purposes of Rule 23(a)(2).   Doc. 68 at 14-15.   The undisputed nature of the questions raised by Plaintiff is irrelevant to the wholly separate inquiry of whether those questions can generate a common answer.   As discussed above, the questions raised by Plaintiff are capable of resolution in one stroke.   This is true regardless of whether Defendants agree with the answers to those questions.   While Defendants' concessions undoubtedly will make the Court's determination of Plaintiff's contentions easier, the Court is hard-pressed to see how Defendants' concessions would negate the commonality of Plaintiff's contentions in the first instance.

In actuality, Defendants' argument that common evidence cannot be used to answer the question of whether each individual class member worked more than 40 hours in any given workweek "does not refute the existence of common issues," but rather suggests "that whatever common issues exist are overwhelmed by issues particular to individual class members." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 157 (S.D.N.Y. 2008).   "As such, [that]

argument is more appropriately addressed below in respect to the predominance requirement." *Id.*

B.    Disputed Rule 23(b)(3) Requirements

1.    Predominance

"Rule 23(b)(3)'s predominance requirement is related to, albeit 'more demanding than,' Rule 23(a)(2)'s commonality requirement." *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (quoting *Comcast Corp.*, 569 U.S. at 34). "The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. To that end, predominance requires that "common questions subject to generalized, classwide proof *predominate* over individual questions." *CGC Holding Co., LLC v. Broad & Cassell*, 773 F.3d 1076, 1087 (10th Cir. 2014) (emphasis in original).

To determine whether a plaintiff meets this requirement, the court "must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Id.* (emphasis in original). "It is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *Id.* (citing *Amgen*, 568 U.S. at 469 (holding that Rule 23(b) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof") (emphasis in original; citations omitted)). Rather, "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *CGC Holding*, 773 F.3d at 1087 (citation omitted). "Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3) – even if there remain individual issues, such as damages,

that must be tried separately." *Naylor Farms*, 923 F.3d at 789 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)).

As explained above, this case "turns" on the common question of whether Defendants' policy of misclassifying their Lease Operators as exempt, in combination with their practice of requiring Lease Operators to work more than 40 hours in a week, "violate the [NMMWA] on a classwide basis." *Perez*, 2016 WL 5719802, at *3. This is "the same question[] that will drive the resolution of this litigation." *Wang v. Chinese Daily News, Inc.*, No. 04-cv-1498, 2014 WL 1712180, at *5 (C.D. Cal. Apr. 15, 2014). The answer to this common question is "susceptible to common proof and hinge[s] on [Defendants'] uniform corporate policies and procedures which govern all of [their Lease Operators]." *Id.* In other words, the common contention that Defendants had "a policy that left [them] liable under the [NMMWA will] prevail or fail for the class as a whole," and "[i]n no event will the individual circumstances of particular class members bear on the inquiry." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 378-79 (7th Cir. 2015) (citation omitted). Courts routinely have found predominance where, as here, the challenged policy is common to the class as a whole and the proposed class members share similar job duties. *See, e.g.*, *Morris*, 2013 WL 1880919, at *12 ("[P]redominance is satisfied where, as here, the 'central issue' is whether defendants had a 'uniform policy or practice' of denying wages for all hours worked, overtime wages, and spread of hours compensation."); *Goldman v. Radioshack Corp.*, 03-cv-32, 2005 WL 1124172, at *4 (E.D. Pa. May 9, 2005) ("The predominate legal issue in this action is whether 'Y' store managers were wrongfully classified as exempt and denied overtime wages."); *Damassia*, 250 F.R.D at 160 ("Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their

classification as exempt, despite arguments about 'individualized' differences in job responsibilities."); *Chado*, 2019 WL 1981042, at * 7 (finding predominance requirement met because "every time Defendant calculated the Specialists' compensation pursuant to its uniform policy, which did not provide for overtime, the class members were exposed to the same risk of harm because compensation was based upon scheduled hours rather than actual hours").

As they did in the context of commonality, Defendants argue that because the Court must first determine "*how many hours a plaintiff worked in a work week*" in order to determine whether Defendants violated the NMMWA, Plaintiff cannot meet the predominance requirement. Doc. 68 at 21 (emphasis in original).   According to Defendants, because Lease Operators "worked different amounts of time," "the need to conduct [a] thorough analysis" into how many hours each class member worked "would easily overwhelm" the common questions.   *Id.* at 20.

Courts have roundly rejected this argument, concluding instead that "[t]he number of hours individual class members worked [] is a question for damages, not liability." *Bitner v. Wyndham Vacation Resorts, Inc.*, No. 13-cv-451, 2016 WL 7480428, at *11 (W.D. Wis. Dec. 29, 2016); *see also Bell*, 800 F.3d at 278-79 ("It makes no difference to the class claim as a whole how many hours . . . each employee worked," as "[t]hese would be issues for the portion of the suit in which individual damages are assessed."); *Morris*, 2013 WL 1880919, at *13 ("Defendants' argument, in essence, amounts to a list of factors that could affect the amount of time [] employees spent [working], and thus the wages to which they would be entitled – i.e. damages issues, not liability issues.").   And, recognizing that "damages determinations are individual in nearly all wage-and-hour class actions," courts routinely have held that "damages calculations alone cannot defeat certification."   *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013); *see also Gomez*, 306 F.R.D. at 168 ("It is well established, however, that the

presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3).") (citation omitted); *Wang*, 2014 WL 1712180, at *5 ("The only individual issues remaining relate to individual plaintiffs' damages, and these cannot defeat certification."); *Rodriguez*, 2020 WL 3000415, at *17 (rejecting defense argument that predominance was defeated "because the percentage of time that employees allegedly worked overtime in New Mexico is not uniform across the class").   Indeed, the Tenth Circuit has specifically held that "[t]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification."   *XTO Energy*, 725 F.3d at 1220.   Applying these principles in circumstances where, as here, the plaintiff's theory of liability is predicated on the blanket application of policies and practices to an entire class, courts have uniformly rejected the notion that predominance is defeated by the specter of individualized inquiries into the numbers of hours worked by each class member.   *See Bitner,* 2016 WL 7480428, at *13 ("[Q]uestions concerning damages for individual class members, such as the number of hours each employee worked, do *not* predominate over the common contention regarding the existence of an unofficial policy.") (emphasis in original); *Morris*, 2013 WL 1880919, at *13 ("Although determinations as to damages will require individualized inquiries here, such inquiries will not bar certification because common liability issues otherwise predominate."); *Delagarza v. Tesoro Refining & Mktg. Co.*, 09-cv-5803, 2011 WL 4017967, at *11 (N.D. Cal. Sept. 8, 2011) ("While there may be some variation within the Golden Eagle refinery with respect to the amount of downtime per shift or number of times per week that employees leave the premises, such variation does not present sufficient evidence that individual questions predominate over Plaintiff's actual theory, which is based on Tesoro's purported general policies."); *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 369 (S.D.N.Y. 2014) ("[I]f the plaintiffs succeed in demonstrating a corporate policy of

routinely denying RiverBay employees compensation for pre- and post-shift work, the primary

hurdle to recovery is likely to consist predominately of arithmetical calculations based on payroll

records and other documentary evidence.   The plaintiffs have therefore established by a

preponderance of the evidence that classwide issues will predominate over individualized

inquiries."); *Gomez*, 306 F.R.D. at 169 (holding that whether PNC had a policy of not

compensating its employees for time they worked beyond 40 hours a week was "relevant to the

extent of PNC's liability, if any, under state and federal overtime laws," that it was "more

efficient to answer this question . . . in one stroke on a class-wide basis," and that, accordingly,

"individualized damages questions [were] not an impediment to class certification"); *Chado*,

2019 WL 1981042, at * 7 ("[T]he common contention of unlawful application of the

compensation policy under the [Maryland wage laws] predominates over individualized inquiries

into how much any particular Specialist is owed.").

　　　None of the cases cited by Defendants persuade the Court to deviate from this precedent.

First, Defendants cite *Casias* for the proposition that "[w]hen, as here, the dispute requires a

court to delve into the actual day-to-day activities of the workers, individualized questions

predominate."   Doc. 68 at 20.   But in *Casias*, the court did not consider, much less rely upon,

variations in the number of hours worked by the putative class members in finding a lack of

predominance.   Rather, the court explained that the courier drivers' challenge to their

employer's practice of classifying them as independent contractors, in the first instance,

depended not on the existence of a "uniform, company-wide policy," as do Plaintiff's claims

here, but rather on each class member's individual testimony as to "his or her own individual

experience."   2014 WL 12710236, at *16.   The court concluded that the merits of the

plaintiffs' claim, *i.e.*, whether their classification as exempt from employment laws was proper,

22

"turn[ed] on their day-to-day work and not upon any company-wide contractual policies." *Id.*
The court defined the relevant inquiry as

> whether the evidence demonstrates that the employer exercised some level of
> centralized control in the form of standardized hierarchy, standardized corporate
> policies and procedures governing employees, uniform training programs, and
> other factors susceptible to common proof, or whether the claims before the court
> will be proved by individualized inquiries into the circumstances of each
> employee.

*Id.* at *18 (citations omitted).   Under that inquiry, the court found that the evidence took the
form of "individualized testimony that disavow[ed]" relevant contractual provisions, rather than
evidence in the form of "company-wide" policies.   *Id.*   In so finding, the court specifically
distinguished the case before it from *Damassia*, where "common issues predominated because
the question whether the FLSA's administrative exemption applied could be answered by
consulting uniformly-applied comprehensive corporate procedures and policies."   *Id.*

Here, there are no factual disputes as to the "circumstances of each employee."   *Id.*   To
the contrary, Defendants concede that the class members were all misclassified as exempt,
performed the same job duties, and were subject to a uniform exemption policy.   Doc. 68 at
14-15.   Thus, this case is akin to *Damassia*, and distinguishable from *Casias*, as the common
question can "be answered by consulting uniformly-applied comprehensive corporate procedures
and policies."   2014 WL 12710236, at *18.   Nothing in *Casias* suggests that where, as here,
liability turns on common evidence, individualized inquiries as to the number of hours worked
by individual class members defeats predominance.

Defendants' reliance on *Kilbourne v. Coca-Cola Co.* is similarly misplaced, as that case,
too, turned on the failure of the plaintiff to establish "evidence of the existence of a [] company-
wide directive . . . or any other unofficial policy or practice that could serve as the 'glue'
necessary to generate common answers on a classwide basis."   No. 14-cv-984, 2015 WL

5117080, at *12 (S.D. Cal. July 29, 2015).   It was that failure, the court explained, that necessitated "individualized inquiries" to determine the merits of the plaintiff's claim.   *Id.* *Kilbourne* is inapposite here, where there is no failure of proof as to company-wide policies and practices.   Accordingly, *Kilbourne* lends no support to Defendants' argument – an argument neither considered nor adopted by the *Kilbourne* court – that individualized inquiries into the number of hours worked by individual class members defeats predominance.

As Defendants acknowledge, pursuant to Rule 24(c)(4), Plaintiff expressly seeks to limit certification in this case to a determination of liability.   Nonetheless, Defendants contend that "the Court cannot ignore how damages are to be calculated in the predominance inquiry," and urge the Court to decline to certify the putative class, even as a liability only-class, because "individual damages issues will remain."   Doc. 68 at 22-23.   The Tenth Circuit, however, has expressly recognized that certification of a class "for liability purposes only, leaving individual damages calculations to subsequent proceedings, " is an appropriate "way[] to preserve the class action model in the face of individualized damages." *XTO Energy*, 725 F.3d at 1220; *accord, In re Motor Fuel Temp. Sales Prac. Litig.*, 292 F.R.D. 653, 666 (D. Kan. 2013) ("Certifying a class to determine the defendant's liability, while leaving the class members to pursue their individual damages claims, is a common example of partial certification") (citation omitted); *see also Tyson Foods*, 136 S. Ct. at 1045 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages.") (citation omitted).

Importantly, even where certification is sought for liability purposes only, "a class's theory of liability [must] track its theory of damages or injury."   *Jacob v. Duane Reade, Inc.*,

293 F.R.D. 578, 592 (S.D.N.Y. 2013).   Thus, a plaintiff must be able to show that [his or her]

damages stemmed from the defendant's actions that created the legal liability."   *Leyva*, 716

F.3d at 514.   Here, this requirement is easily met, as each class member's claim "is the same:

he [was] wrongfully classified as a statutorily exempt employee and, as such, was never paid the

overtime compensation to which he was entitled.   [T]he injury here – lack of overtime – clearly

stems from one, common harm – the uniform misclassification of all [Lease Operators]."

*Jacob*, 293 F.R.D. at 592.

Accordingly, "certification of the class for liability purposes will clearly advance the

litigation in a meaningful way."   *Id.* at 593.   Defendants' misclassification of their Lease

Operators "will have necessarily caused a uniform type of injury to class members:   namely, the

lack of overtime pay to which all class members would be entitled.   The only remaining

question then will be how much each individual is owed – an inquiry that may require varying

levels of individualized proof," as Defendants emphatically claim.   *Id.*   For this very reason,

"this instance is one in which the certification of the liability class is particularly appropriate."

*Id.*; *see also Leyva*, 716 F.3d at 514 ("Here . . . if putative class members prove Medline's

liability, damages will be calculated based on the wages each employee lost due to Medline's

unlawful practices. . . . [D]amages could feasibly and efficiently be calculated once the common

liability questions are adjudicated.").   *Id.*

In light of Plaintiff's request that certification be granted as to liability only, the Court

finds that, despite variations in the hours that individual class members worked, the proposed

class of Lease Operators, all of whom were denied overtime pay as a result of their

misclassification as exempt, is sufficiently cohesive to warrant adjudication by representation.

Accordingly, Plaintiff has met the Rule 23(b)(3) predominance requirement.

25

2.    Superiority

In addition to predominance, Rule 23(b) requires that Plaintiff show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).   In determining superiority, the Court considers four factors:   (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class.   *Id.*   After considering these factors, courts "routinely hold that a class action is superior where, as here, potential class members are aggrieved by the same policy, the damages suffered are small in relation to the expense and burden of individual litigation and many potential class members are currently employed by Defendant."   *Morris*, 2013 WL 1880919, at *14; *see also Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 622-23 (C.D. Cal. 2015) ("[C]ourts considering wage and hour cases . . . routinely find that the class action device is superior to other forms of adjudication.").

With regard to the first and second factors of the superiority inquiry, Plaintiff states that "[t]his case is the first, and so far only, lawsuit begun by any Lease Operator against Defendants for unpaid overtime."   Doc. 62 at 23.   Defendants do not dispute this statement.   Indeed, there is no evidence of any interest by individual class members in controlling the prosecution of separate actions or the existence of any such actions.   Nonetheless, Defendants argue that a class action is not superior to individual litigation because, given the class members' alleged entitlement to "significant amounts of overtime," their individual claims have "substantial value" and thus the cost of individual litigation would not outweigh their likely recovery.   Doc. 68 at

25.

Defendants provide no support for this contention, which is belied by the evidence that Defendants offered only $1,000 per year of service "to compensate" class members for unpaid overtime under the NMMWA.   Doc. 64-2 at 4.    Given this evidence, the Court agrees with Plaintiff that, "without class certification, it is likely that the [NMMWA] violations Plaintiff alleges would go unadjudicated."   Doc. 62 at 24.    Indeed, courts routinely reach this conclusion under circumstances analogous to those here.   *See Bitner*, 2016 WL 7480428, at *12 ("[T]here is also no guarantee that class members would bring their own lawsuits, since litigation costs may outweigh individual damages for many class members."); *Leyva*, 716 F.3d at 515 ("In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims"); *Jacob*, 289 F.R.D. at 423 ("For a single, potentially misclassified ASM, the impetus to sue an employer for what might constitute a small economic return is minimal. . . . [T]he burden and expense of individual litigation would likely be prohibitive for most ASM plaintiffs.").    In keeping with this precedent, the Court finds that "[t]he interest of the class as a whole to litigate the predominant common questions substantially outweighs any interest of individual members to bring and prosecute separate actions."   *Morris*, 2013 WL 1880919, at *15.

The third factor of the superiority test "consists of two prongs:   (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute."   *Rodriguez*, 2020 WL 3000415, at *18 (citation omitted).    "The first prong is considered a recitation of the general superiority inquiry while the second prong is whether the particular court at issue is a desirable forum for the litigation."   *Id.*

The Court interprets Defendants' contentions that "[a] class action would be inefficient

27

and wasteful" to go toward the first prong of the third factor.   Doc. 68 at 27.   In support of that

contention, Defendants rehash their arguments against commonality and predominance, namely,

that "separate analyses of individual evidence will be required to determine whether Mewbourne

is liable to every plaintiff in this case," and that "a class would provide no meaningful efficiency,

as it would lead to a plaintiff-by-plaintiff damages analysis."   Doc. 68 at 28.   The Court has

addressed and rejected these arguments in the context of commonality and predominance and

rejects them for the same reason here:   variation in hours worked by individual class members

is a damages, rather than a liability issue, and "the amount of damages is invariably an individual

question and does not defeat class action treatment."   *Delagarza*, 2011 WL 4017967, at *17.

Relevant to the instant inquiry, "[w]hile determining damages may well require separate trials, or

at least individualized proof, . . . the need for separate damages trials does not preclude a finding

of superiority."   *Bitner*, 2016 WL 7480428, at *12; *see also Leyva*, 716 F.3d at 515 (reversing

district court's finding that class action was not superior where it based its finding "on the need

to individually calculate damages").   Indeed, "while Defendant[s] points to the possibility that

certain damages issues will be difficult to calculate, on the whole [they do] not demonstrate that

consolidating [] individual actions or requiring plaintiffs to intervene would save the parties or

the Court time or money, or ensure a fairer process for the parties."   *Delagarza*, 2011 WL

4017967, at *17.   Thus, the issues raised by Defendants "are not substantial enough to

overwhelm the benefits of classwide resolution."   *Id.*

The Court finds persuasive Plaintiff's argument that aggregation would promote

"efficiency and expediency," as "there is no dispute that the Class members were never paid

overtime when paid on a salary-plus-bonus basis."   Doc. 62 at 24.   As other courts have found,

this Court, too, finds that "a single, class trial on whether a[ ] policy existed is far superior in

terms of efficiency to requiring multiple individual actions seeking resolution of the same liability question." *Bitner*, 2016 WL 7480428, at *12; *see also Rodriguez,* 2020 WL 3000415, at *18 ("[J]udicial economy supports aggregation of numerous [NM]MWA claims rather than numerous individual claims."); *Jacob*, 289 F.R.D. at 423 (finding superiority where "[t]he alleged misclassification [] applie[d] to an entire class of employees' duties, rather than case-by-case determination").   Thus, aggregation is desirable.

Similarly, this Court is a desirable forum to adjudicate the aggregated dispute.   The class is limited to those members who worked for Defendants in New Mexico.   Thus, "the locus of the harm, as well as any other events forming the basis of the action," is in this district. *Rodriguez*, 2020 WL 3000415, at *18.   Defendants have presented no evidence to suggest that this Court would be less convenient or otherwise less desirable than any other forum.

Finally, the fourth superiority factor considers the likely difficulties in managing a class. According to Plaintiff, given that the class is limited to liability issues only, there should be no difficulties in managing the class. Doc. 79 at 17.   Rather than addressing Plaintiff's argument, Defendants turn the relevant inquiry on its head, arguing not that a class action is unmanageable, but that "[i]ndividual adjudication would be manageable."   Doc. 68 at 26.   In so arguing, Defendants rehash their arguments against numerosity, namely that the class is "not overwhelmingly large," and that joinder not impracticable.   Doc. 68 at 26-27.   Not only are these arguments irrelevant in the context of superiority, but also the Court has addressed and rejected these arguments in finding the numerosity requirement met.

The Court agrees with Plaintiff that there is no indication that managing a class would be difficult here.   To the contrary, "[g]iven the relatively small size of the putative class and its discrete geographical location, the Court does not foresee manageability issues precluding

certification."   *Rodriguez,* 2020 WL 3000415, at *18; *see also Jacob*, 289 F.R.D. at 423

(finding that the class was manageable where it "constitute[d] fewer than 1,000 putative

members, and [was] concentrated in a single, geographic area, rather than spanning the nation,"

and where the class members' duties were "more alike than they [were] dissimilar, and as such,

len[t] themselves to determination as a class").   Accordingly, each of the relevant factors

weighs in favor of finding that the Rule 23(b)(3) superiority requirement is met.

      C.    <u>Definition of the Class</u>

      Plaintiff seeks certification of a class defined as "all of Defendants' current and former

Lease Operators who, in at least one workweek between June 19, 2009 and June 21, 2017, were

paid a salary with no overtime and who worked for Defendants in New Mexico."   Defendants

argue that, if the Court finds certification proper, it should limit the class to those individuals

employed as Lease Operators "no earlier than three years before the lawsuit was filed."   Doc.

68 at 29.   According to Defendants, this limitation is necessary because New Mexico law

provides that "[a] civil action to enforce any provision of [the NMMWA] shall be commenced

within three years after a violation last occurs."   N.M. Stat. Ann. 1978, § 37-1-5 (2009).

      Plaintiff, however, alleges that Defendants engaged in a continuing course of conduct.

"New Mexico law provides that '[a] civil action to enforce any provision of [the NMMWA] may

encompass all violations that occurred as part of a continuing course of conduct regardless of the

date on which they occurred.'"   *Meador v. QES Wireline LLC*, No. 17-cv-00586, 2018 WL

6164430, at *3 (D.N.M. June 26, 2018) (quoting N.M. Stat. Ann. 1978, § 50-4-32).   Defendants

acknowledge the language of Section 50-4-32 but argue that it should not be interpreted to

permit a plaintiff who "allows three years to elapse before filing" a claim to be part of the class.

Doc. 68 at 29.   According to Defendants, including class members whose only claims date back

further than three years would be at odds with the three-year limitation period set forth in Section 37-1-5.

The Court does not find Defendants' argument persuasive.   First, this Court has interpreted Section 50-4-32 to mean that, "where a continuing course of conduct is involved, there is essentially no limitations period for [a NMMWA] claim," and the Court has found no authority to the contrary.   *Olivo v. Crawford Chevrolet, Inc.,* No. 10-cv-782, 2011 WL 13137328, at *3 (D.N.M. Sept. 20, 2011).   Further, Defendants do not contest that Plaintiff himself has brought his claims within the three-year limitations period.   Thus, assuming *arguendo* that Section 37-1-5 is the operative provision, this action was timely commenced. Plaintiff alleges a continuing course of conduct, and accordingly, pursuant to Section 50-4-32, all violations that occurred as part of that course of conduct, regardless of the date on which they occurred, may be included in Plaintiff's action.   There is nothing in Section 37-1-5 to suggest that including class members who were affected by that continuing course of conduct would run afoul of Section 37-1-5.

Moreover, the cases cited by Defendants are inapposite and fail to support their argument that limitation of the class is warranted.   Defendants cite *Cottman v. Naskrent*, No. 17-cv-2045, 2018 WL 4335441 (D. Ariz. Sept. 11, 2018), in which the court stated that plaintiffs had "crafted the putative class without considering, or even acknowledging, the statute of limitations for actions brought pursuant to the [Arizona Minimum Wage Act]."   *Id.* at *5.   In a footnote, the court noted that "[t]he AMWA largely mirrors the FLSA and requires that a plaintiff commence a civil action 'no later than two years after a violation last occurs, or three years in the case of a willful violation'; however, a plaintiff may include violations that occurred prior to the statute of limitations running if part of 'a continuing course of employer conduct' and if an act occurred

31

within the statute of limitations."   *Id.* at *5 n.7.   The court in *Cottman* is silent as to the way in which the plaintiff did not consider the statute of limitations.   Nowhere does the court address, much less adopt, Defendants' argument that where, as here, a plaintiff has filed an action within the applicable limitations period, a putative class may not include individuals against whom violations occurred outside of the limitations period, where those violations are alleged to be part of a continuing course of employer conduct.   Defendants also cite *Hernandez v. Ray Domenico Farms, Inc.*, 414 P.3d 700 (Colo. 2018), in which the court resolved the unrelated question of when the relevant Colorado statute of limitations begins to run on claims by terminated employees for previously earned yet unpaid wages.   *Id.* at 704.   Again, the court in *Hernandez* did not address or resolve the issue raised by Defendants here.

Finally, Defendants argue that their proposed limitation to the class is warranted because Plaintiff has not demonstrated that Defendants engaged in a continuing course of conduct, and that Section 50-4-32 thus does not apply in the first instance.   Defendants have provided no authority to suggest that, at this stage of the litigation, Plaintiff must do more than adequately allege that Defendants engaged in a continuing course of conduct, which Plaintiff has successfully done.   In the face of Plaintiff's well-pled allegations, the Court finds no basis to conclude at this juncture that Defendants did not engage in a continuing course of conduct. Thus, Section 50-4-32 is applicable and, pursuant to this Court's interpretation of that provision, Plaintiff has properly defined the class.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has satisfied his burden of affirmatively demonstrating that the Rule 23 prerequisites exist in fact, and that the class that he has proposed should be certified.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Class Certification for Liability Only under Rule 23(b)(3) ("Motion for Class Certification") [Doc. 62] is **GRANTED**, as follows:

1.      The Court certifies the following class:    all of Defendants' current and former Lease Operators who, in at least one workweek between June 19, 2009 and June 21, 2017, were paid a salary with no overtime and who worked for Defendants in New Mexico.

2.      In accordance with this Court's July 2020 Opinion, Defendants shall notify any individual who signed a Release of the right to invalidate that Release and participate in this action for purposes of pursuing NMMWA claims against Defendants.


DATED this 16th day of November 2020.

MARTHA VÁZQUEZ
United States District Judge